UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LUIS GALARZA,
*Plaintiff*,

v.

No. 3:18-cv-00663 (JAM)

SCOTT ERFE, *et al.*,
*Defendants*.

**ORDER DISMISSING COMPLAINT
PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Luis Galarza is a sentenced prisoner in the custody of the Connecticut Department of Correction. He has filed this complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 to challenge his treatment by prison officials in connection with a security investigation that disclosed Galarza's use of an iPhone in prison. For the reasons set forth below, I conclude that Galarza has not alleged facts that give rise to plausible grounds for relief as any of his constitutional claims. Therefore, I will dismiss the complaint without prejudice.

### BACKGROUND

The facts here involve Galarza's detention in 2018 at Cheshire Correctional Institution (Cheshire) and MacDougall-Walker Correctional Institution (MacDougall). Galarza names seventeen defendants, all of whom are officials of the Connecticut Department of Correction: Wardens Scott Erfe, William Mulligan, and Hannal; Commissioner Scott S. Semple; Deputy Commissioner Monica Rinaldi; RHU Administrators James Watson and D. Synott; Lieutenants Boyd and Schneider; Correctional Officers Peracchio, Wright, "Laone/John Smith," Vergas, and Verdura; Administrative Remedies Coordinator Boyd-Carter; Health Services Staff "Cruz/Jane Smith"; and Investigator CC Green. All dates referenced in the complaint took place in 2018.

On January 26, 2018, Lieutenant Boyd and Officers Wright, Vergas, Verdura, and Peracchio entered Galarza's cell while he was sleeping. Wright and Peracchio jumped on him, put him in handcuffs, and escorted him to the restrictive housing unit ("RHU"). Peracchio twisted Galarza's hands into such an awkward position during the escort that Galarza asked him to stop using so much force. Upon reaching the dayroom, the officers asked Galarza if he had any problems with their strip search policy. He said he did not, though he did not know what the policy was. When they asked Galarza to spread his buttocks with his hands, he felt that his rights were being violated. He said nothing, however, because Boyd was holding a can of mace, and Galarza feared that he would use the chemical agent. After the search, Galarza was given a red jumpsuit and placed in RHU cell 22. Doc. #1 at 9.

On January 29, the same officers questioned Galarza about an iPhone found in inmate Angel Lorenzo's cell. Galarza said he had not used the phone and asked whether anyone had found a phone in his possession or in his cell. Boyd said no, but Verdura said that he knew that Galarza had used the phone. The officers asked Galarza if he knew which correctional officer had brought the phone into the facility. He responded that no phone had been found in his possession and that he did not know who had brought it in. *Id.* at 9-10.

Two days later, the officers questioned Galarza a second time, this time with additional information from a confidential informant. They showed Galarza copies of phone records but did not permit him to read them. Vergas told Galarza that the list contained numbers he had called, and the officers charged him with possession of contraband even though inmate Lorenzo had confessed to exclusive possession of the phone. The officers threatened Galarza with criminal charges, and Verdura threatened his family. Boyd threatened to place him on high security status. Vergas and Verdura began talking about his confidential legal matters and reading his legal

documents. Vergas and Verdura told him that everything could "disappear" if he told them who brought the iPhone into the facility. Boyd gave him 24 hours to think about helping the officers. *Id*. at 10-11.

On February 22, Galarza received two disciplinary reports. *Id*. at 13, 43–44 (copies of the disciplinary reports). The reports charged Galarza with use of a contraband iPhone, stating that "the Cheshire CI Intelligence Unit was able to verify inmate Galarza knowingly possessed, used and orchestrated the conveyance of the contraband I-Phone into the facility." *Id.* at 44.

On March 1, Galarza received a restrictive housing unit status order stating that he would remain in RHU until he got transferred to another facility. *Id.* at 15. A disciplinary hearing regarding the alleged cell phone possession took place on March 14. Galarza waived his right to appear at the disciplinary hearing. Although he pleaded not guilty, the hearing officer found him guilty on both charges. *Id.* at 16, 75-77 (disciplinary process summary reports). The disciplinary report findings detailed how the internal investigation had linked Galarza to data on the recovered iPhone. *Ibid.* On March 18, Galarza appealed both disciplinary findings. Id. at 17.

In the meantime, on or about March 15, Galarza was transferred from Cheshire to MacDougall. *See id.* at 79, 83, 87. On April 9, he was placed on High Security Status at MacDougall. Galarza alleges that the form he received about this classification was missing a date, the name of the staff member who made the high security decision, or a date for a hearing, in violation of his due process rights. *Id.* at 17, Doc. #13 at 4.

Galarza submitted at least fifteen grievances and inmate request forms between January 26, 2018, the date of the initial incident, and August 7, 2018, when he drafted his amended complaint. On February 5, he sent an inmate request form to Captain Watson complaining about the strip search procedure, and another complaining that Watson made his own policy and did

3

not follow department directives. Doc. #1 at 11. On February 8, Galarza submitted a Freedom of Information Act ("FOIA") request seeking copies of the phone records for the iPhone. The request was denied because the investigation was ongoing. *Ibid*. On February 12, Galarza spoke to the investigator, Officer Wright, and asked why he had been in the RHU for 17 days without receiving a disciplinary ticket and despite department policy permitting only 14 days for investigation. Wright responded that he had the authority to request an additional 14 days for the investigation. Galarza never received notification of any extension. *Id*. at 11-12. Galarza then submitted a grievance form about his RHU stay, which was returned for failure to attach documentation of an attempt at informal resolution. *Id*. at 12, 30-32.

On February 20, Galarza wrote to Watson stating that his privacy was not respected while speaking to his attorney. *Id*. at 13. He also complained to the prison warden that he had been in RHU for 26 days without disciplinary charges or notification of an extension of time to investigate. Galarza threatened civil action if he was not released from RHU. On February 22, Galarza submitted another FOIA request for phone records and physical evidence, which was again denied on the grounds that the investigation was still ongoing, though Galarza alleges that it was complete. *Ibid.* He submitted another inmate request form to Captain Watson about being placed in a "nasty, dirty, rusty cell," and he wrote to Health Services staff complaining that he had been in RHU for 31 days without being seen by mental health staff. Departmental directives require that any inmate on restrictive status for more than 30 days be interviewed by a psychiatrist or psychologist. *Id.* at 14; Conn. Department of Correction, Administrative Directive 9.4, Restrictive Status, §17(D) (2010).

On February 27, Galarza submitted another grievance form, which Coordinator Boyd-Carter returned for failure to attach an inmate request form. *Id.* at 14-15. Galarza then submitted

another inmate request because no disciplinary hearing had been conducted after he received the disciplinary reports. Captain Watson told Galarza to address this concern to the disciplinary investigator. On March 6, Galarza wrote an inmate request to Warden Erfe complaining that in the restrictive housing unit there was "rust all over the walls, mold on the air-van, dirty walls, no table to write," and "I'm getting charge for postage," and "can't use a pen on Tuesday or Thursday." *Id*. at 15-16, 68.

After his transfer to MacDougall on or around March 15, Galarza submitted a lost property investigation form and a grievance against Watson for his time in RHU at Cheshire. *Id.* at 17, 83. He also appealed his placement on high security and asked to be removed from this status. Doc. #13 at 4-5. His appeal was forwarded to Deputy Commissioner Rinaldi, but Captain Synott was the one to respond to it, explaining that the appeal was denied because it was determined, after a review of the circumstances, that Galarza met the criteria for high security status. *Id*. at 5-6. Galarza sent a letter to Commissioner Semple alleging that his rights had been violated, but Semple never responded. *Ibid.*

On July 23, Galarza received through a Freedom of Information request a copy of a letter that the Director of Offender Classification & Population Management had sent to Warden Mulligan. The letter recommended that Galarza be placed on high security status and instructed Mulligan to hold a classification hearing to inform Galarza about the placement. The hearing never happened. *Id*. at 7.

Galarza alleges that he has exhausted his administrative remedies, and he attaches numerous documents to his complaint. He seeks relief under the Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution.

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the compliant, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater,* 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a pro se complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Moreover, a federal court complaint may only proceed under 42 U.S.C. § 1983 if it alleges facts that plausibly establish a violation of the U.S. Constitution. To the extent that Galarza's complaint alleges multiple violations of prison regulations under the Department of Corrections' Administrative Directive, it should be clear that a violation of a prison regulation does not necessarily establish that there has also been a violation of the Constitution. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995).

*Excessive force*

Galarza alleges that on January 26, 2018, Peracchio "jump[ed] on plaintiff while plaintiff was sleeping" and that he was placed in handcuffs and had to tell Peracchio "to stop putting so much force on his wrists because c/o Peracchio was twisting plaintiff hands in a awkward position," all while Galarza was taken from his cell and placed into restrictive housing. Doc. #1 at 9.

The Eighth Amendment prohibits the use of excessive force against sentenced prisoners even if a prisoner does not suffer serious injury. *See Wilkins v. Gaddy*, 559 U.S. 34, 34 (*per curiam*). Still, "[t]his is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry," and "[a]n inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* at 38 (internal quotation marks omitted). Here, in the absence of any more than an allegation of one correctional officer jumping on Galarza and Galarza's hands being briefly twisted into an awkward position, Galarza has failed to allege facts that give rise to plausible grounds for a claim of excessive force in violation of the Eighth Amendment.

*Strip search*

Galarza also alleges that following his removal from his cell on January 26, 2018, he was subject to a strip search that required him to spread his buttock cheeks for a visual inspection. Doc. #1 at 9. Although prisoners have certain privacy rights, prison officials have a compelling interest in the detection of contraband, and a strip search of a prisoner may be justified by legitimate security and penological objectives. *See, e.g.*, *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012); *see also Bell v. Wolfish*, 441 U.S. 520, 558-61 (1979) (upholding challenges to strip search policy requiring inmates to spread buttocks following contact visits);

*Harris v. Miller*, 818 F.3d 49, 57-65 (2d Cir. 2016) (*per curiam*) (discussing restrictions of the Fourth Amendment and Eighth Amendment on visual body cavity searches).

The complaint makes clear that the search of Galarza took place in the context of an investigation for prison contraband that involved the recovery of an iPhone from another inmate. Accordingly, Galarza has failed to allege facts that give rise to plausible grounds to conclude that there was no penological objective to support the requirement that he spread his buttocks for a visual inspection for contraband by prison officials. At the least, because there is no clearly established constitutional rule that would foreclose prison officials from subjecting an inmate to a visual buttocks search during the course of a contraband investigation, defendants are entitled to qualified immunity from Galarza's claim. *See Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015).

### *Detention in restricted housing at Cheshire CI*

Galarza complains that he was unfairly subjected to detention in highly restrictive housing for approximately 48 days from January 26, 2018, to his eventual transfer from Cheshire to MacDougall on or about March 15, 2018. According to Galarza, the detention was unfair because he was innocent of the disciplinary charges and because he did not timely receive notice of the charges and a disciplinary hearing as required under prison regulations. I understand these facts to suggest a potential claim for a violation of the Due Process Clause of the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The "standard analysis" for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a

person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) *(per curiam)*.

In the prison context—involving prisoners whose liberty interests have already been severely restricted because of their confinement—a prisoner plaintiff who complains of adverse action without due process must show that the adverse action amounted to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Thus, in *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not sustain an atypical and significant hardship to constitute a deprivation of a liberty interest that would be subject to protection under the Due Process Clause. *Id.* at 486. The Supreme Court noted as well that disciplinary custody was not atypical because "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Ibid.*

Following *Sandin*, the Second Circuit has explained that the "factors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal citations and quotations omitted). The Second Circuit has further observed that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) *(per curiam)*. It has noted that "SHU [special housing unit] confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more

9

severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Ibid.* (internal quotations omitted).

Galarza's restrictive confinement at Cheshire for a period of 48 days falls well below the length of time that ordinarily gives rise to a liberty interest for purposes of a due process claim. Moreover, Galarza does not allege facts to show that his conditions of confinement were substantially more onerous relative to the usual restrictions of imprisonment, whether in the general population or in restrictive housing imposed for non-disciplinary-related reasons. Galarza alleges simply that he was required to reside in a "nasty, dirty, rusty cell," doc. #1 at 14, and he complains that he had to pay for postage, did not have a writing table, and could not use a pen every day, *id*. at 68.

These allegations fall short of alleging conditions involving substantially atypical conditions of confinement. *See Jones v. Tompkins*, 715 F. App'x 101, 102 (2d Cir. 2018) (affirming dismissal of due process claim because prisoner "failed to allege that the conditions of the 90-day SHU sentence were more onerous than usual") (internal quotations omitted); *St. Louis v. McClain*, 2018 WL 6421060, at *3 (D. Conn. 2018) (dismissing procedural due process claim of prisoner who was in segregated housing for 30 days where "he was denied his personal property, mail, church services, contact visits, phone privileges, commissary privileges, and recreation" because "these deprivations are insufficient to establish an atypical and significant hardship") (internal quotations omitted); *Manon v. Brantly,* 2017 WL 4050307, at *6 (D. Conn. 2017) (dismissing complaint for failure of prisoner who was in segregated and special housing for a period of 60 days to allege facts showing how these housing conditions amounted to a substantial and atypical hardship).

10

In addition, even assuming Galarza had a liberty interest at stake, he has not alleged facts to show that he did not receive the constitutional process that he was due. As to his initial restricted administrative status pending the outcome of the investigation, the Constitution requires that an inmate "must merely receive some notice of the charges against him and an opportunity to present his views." *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). As the complaint and attached documents show, Galarza was well aware of the basis for investigation and repeatedly met with prison officials to be interviewed about it. Doc. #1 at 9-10.

In the context of a prison disciplinary action, "[t]he due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). "Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Ibid.* Following an investigation, Galarza was subsequently formally charged in writing on February 22, 2018, and afforded a hearing on March 14, 2018, that he chose not to attend and that substantiated the charges against him in person. *Id.* at 13, 16, 43-44, 75-77. In view of the complexity of the investigation involving obtaining telephone records for the contraband iPhone and determining any connection to Galarza, there is no basis to conclude that the length of the investigation was constitutionally unreasonable. Galarza has not alleged facts that give rise to plausible grounds for relief under the Due Process Clause for his 48 days of restrictive confinement at Cheshire.

### *High security designation at MacDougall-Walker*

By means of an amendment to his initial complaint, Galarza alleges that after his transfer to MacDougall he was designated for a "High Security" restrictive status on April 9, 2018, without any hearing, and that his appeal of this status was delayed due to an administrative error. Doc. #13; Doc. #1 at 91. Because Galarza does not allege that his "High Security" designation at MacDougall was accompanied by restrictive conditions that constitute a substantial and atypical hardship, he has not alleged plausible grounds to conclude that his constitutional right to procedural due process was violated. *See Groomes v. Frazir*, 2017 WL 7410991, at *3 (D. Conn. 2017) (dismissing challenge to "High Security" status designation because "there are no allegations in the Amended Complaint suggesting that the conditions under which Groomes was confined during the time period he remained on High Security status subjected him to an atypical and significant hardship"), *reconsideration denied*, 2018 WL 745954 (D. Conn. 2018).

### *Failure to respond to grievances*

Galarza alleges that his grievances were incorrectly returned without disposition or not considered in a timely manner, and that he received no responses to the many inmate requests that he submitted. Because the Constitution does not require prison officials to create administrative grievance procedures, the "failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddel*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (collecting cases); *see also Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (prisoner's "claim that defendants violated his due process rights by restricting his access to the prison's grievance procedures confuses a state-created procedural entitlement with a constitutional right").

*Mental health check*

Galarza complains that during his restrictive confinement at Cheshire he did not receive a timely visit from mental health staff as required by prison regulations. Doc. #1 at 14. The Constitution, however, does not create a right for prisoners to receive monthly mental health evaluations. Moreover, the record shows that Galarza was seen on February 26, 2018, which was 31 days after he was placed in restrictive housing, doc. #1 at 51, and consistent with the prison regulations specifying that "[w]hen an inmate remains on restrictive housing status beyond thirty days, a psychologist or psychiatrist shall conduct a personal interview with the inmate . . . ." Conn. Department of Correction, Administrative Directive 9.4, Restrictive Status Review, §17(D) (2010).

*Interference with attorney-client relationship*

Galarza alleges that on February 20, 2018, he complained about the fact that two unnamed correctional officers "were right next to the plaintiff while plaintiff [was] talking to his attorney." Doc. #1 at 13. Galarza does not describe any prejudice or harm resulting from this single incident, and his grievance form reflects a response by a prison official that the officers were required to keep him in their line of sight. *Id.* at 39. In the absence of any further facts to suggest improper action by correctional officers, Galarza has failed to allege plausible grounds to conclude that his constitutional rights were violated by officers standing too close to him during his communication with his attorney. Nor does Galarza identify or name as defendants the officers who allegedly stood too close to him. Similarly, to the extent that Galarza accuses officers of reading his legal mail or documents, these factual allegations are too conclusory and vague to give rise to plausible grounds for relief.

*Lost property*

Galarza complains that unspecified items of his property were lost or taken by correctional officers at Cheshire. Doc. #1 at 17, 83. Because Galarza fails to reasonably specify what property was taken and because Connecticut provides a constitutionally adequate procedure for seeking the return of any lost or missing property, he has failed to allege plausible grounds for relief under the Due Process Clause arising from the failure to return his property. *See Riddick*, 731 F. App'x at 13 (noting that "Connecticut provides inmates with a remedy for lost or destroyed property" and that the "complaint did not assert that filing a claim with the Claims Commissioner was an inadequate remedy for his lost property claim and thus failed to allege a violation of his due process rights").

*Ninth Amendment*

Galarza alleges a violation of the Ninth Amendment. This claim lacks merit, because the Ninth Amendment does not confer a private right of action pursuant to § 1983. *See Phillips v. City of New York,* 775 F.3d 538, 544 (2d Cir. 2015) (*per curiam*).

CONCLUSION

For the foregoing reasons, the Court DISMISSES the complaint as amended. Docs. #1, #13. The Court's dismissal is without prejudice to the filing of a motion to re-open this action along with an amended complaint by February 7, 2019, in the event that Galarza is able to allege additional facts that would suffice to state plausible grounds for relief. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 7th day of January 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge